[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON ACQUITTEE'S MOTION TO STRIKE, ACQUITTEE'S MOTION TO DISMISS AND STATE'S PETITION FOR CONTINUED
CT Page 2931 COMMITMENT OF ACOUITTEE
I. PROCEDURAL AND FACTUAL BACKGROUND.
On September 21, 1993, the acquittee, Tyrone McClellan, was acquitted by reason of mental disease or defect of the charges of Sexual Assault in the Third Degree and Unlawful Restraint in the Second Degree. Subsequent to that acquittal, Mr. McClellan was committed to the jurisdiction of the Psychiatric Security Review Board (hereinafter, the PSRB or the Board) for a period of time not to exceed six years. On September 19, 1999, this court recommitted Mr. McClellan to the PSRB's jurisdiction for a period of time not to exceed two and one half years. Accordingly, Mr. McClellan's term under the PSRB expires on March 19, 2002.
By petition dated September 10, 2001, the New London State's Attorney filed a Petition for Order of Continued Commitment of Acquittee in accordance with C.G.S. Section 17a-593 (c). Pursuant to C.G.S., Section 17a-593 (d), the PSRB held a hearing on November 2, 2001, to assist in preparing a report to the court. On December 7, 2001, the PSRB filed its report which is part of the court's file. The PSRB found that Mr. McClellan remained mentally ill, continued to be a danger to himself and/or others, required continued inpatient treatment, and recommended that he be recommitted to the PSRB for a period not to exceed five years.
On January 18, 2002, the acquittee filed a Notice of Intention to Perform a Separate Examination. A report of said examination, dated February 25, 2002, was prepared by Dr. Peter M. Zeman and is part of the court's file.
On January 24, 2002, the acquittee filed a Motion to Strike the PSRB's December 7, 2002 report, claiming that it should not be considered as evidence in the recommitment hearing before the court. On the same date, the acquittee filed a Motion to Dismiss claiming that the entire recommitment procedure after an acquittee has reached his maximum term of confinement is unconstitutional. On February 27, 2002, the PSRB filed a Memorandum in Opposition to the Acquittee's Motion to Strike. The acquittee filed a Trial Memorandum on February 28, 2002, and filed a Response to the PSRB's Opposition to the Motion to Strike on March 5, 2002.
A hearing on the motions and petition commenced on February 28, 2002, and concluded on March 7, 2002. At that time all parties were represented and had an opportunity to be heard. The state presented two witnesses: CT Page 2932 Paul Rouleau, LSCW, a forensic monitor at Connecticut Valley Hospital, who has monitored Mr. McClellan since late 1999 and Dr. Patrick Fox, a consulting forensic psychiatrist, who has been managing Mr. McClellan's psychiatric issues since July of 1999. The acquittee presented one witness: Dr. Peter Zeman, a psychiatrist from the Institute of Living, who conducted an independent psychiatric examination of Mr. McClellan.
II. DISCUSSION
A. THE MOTION TO STRIKE
In his Motion to Strike the acquittee, Tyrone McClellan, requests the court to strike the PSRB's December 7, 2001 report and recommendation to the court and not consider the Board's recommendation to recommit Mr. McClellan. The acquittee argues that since his maximum term has expired, the court must apply the standard established in State v. Metz,230 Conn. 400 (1994). Further, acquittee argues that because his maximum term has expired, the implicit extension of Metz requires this court to use the civil commitment proceeding standard when reviewing any request for recommitment. To do otherwise would violate the acquittee's constitutional rights. Mr. McClellan claims that the PSRB report and recommendation should be disallowed as civil commitment proceedings do not provide for such a report.
In response, the PSRB argues that its report and recommendation to the court are mandated by statute, are impartial, and do not bind the court which serves as the final arbiter on any petition for recommitment. The PSRB claims that Metz does not require this court to utilize a civil commitment standard now that Mr. McClellan's maximum term has expired, and the court's failure to implement such a standard in no way violates any of Mr. McClellan's constitutional rights.
C.G.S. Section 17a-580 et seq codifies procedures for acquittees with psychiatric disabilities. Under Section 17a-582, when any person who is charged with a criminal offense is found not guilty by reason of mental disease or defect, the court orders that acquittee committed to the custody of the Commissioner of Mental Health and Addiction Services who in turn confines the acquittee in any of the state hospitals for psychiatric disabilities. C.G.S. Section 17a-582 (a). Within 45 days of the acquittee's commitment, the hospital superintendent has the acquittee examined and files a report of the examination with the court, including findings and conclusions as to whether the acquittee is a person who should be discharged. C.G.S. Section 17a-582 (b). Statutory provisions exist to allow the acquittee to request a separate examination. C.G.S. Section 17a-582 (c). If such an examination is requested, upon its completion, it is filed with the court, and a hearing is held regarding CT Page 2933 whether or not the acquittee should be discharged. C.G.S. Section 17a-582
(d). At said hearing, the court is required to make findings as to the mental condition of the acquittee, and while considering protection of society as its primary concern, make an order to either confine, conditionally release, or discharge the acquittee. C.G.S. Sections 17-582 (e)(1) and (2). At such a hearing the burden of proof for discharge is on the acquittee and that burden is by a preponderance of the evidence standard. C.G.S. Section 17a-582 (f).
The acquittee remains under the jurisdiction of the PSRB until discharged by the court pursuant to procedures set out in C.G.S. Section17a-593. The acquittee is immediately discharged at the expiration of the maximum term of commitment unless the state's attorney feels reasonable cause exists to believe that the acquittee is still a person with psychiatric disabilities and that discharge at the expiration of his maximum term of commitment would constitute a danger to himself or others. A petition for continued commitment must be filed by the state's attorney at least 135 days prior to the expiration date. C.G.S. Sections17a-582 (h) and 17a-593 (c).
This statutory scheme is the one followed in the instant case. Mr. McClellan's maximum term of commitment commenced on September 21, 1993, for a period of six years and would have expired on September 20, 1999. On April 1, 1999, the State's Attorney petitioned for an Order of Continued Commitment which was heard and granted by this court on September 19, 1999, recommitting him to the PSRB for a period of two and one half years. That commitment is due to expire on March 19, 2002. The State's Attorney filed its second petition for an Order of Continued Commitment on September 10, 2001.
In 1994, our state Supreme Court decided State v. Metz, 230 Conn. 400
(1994). In that case, Mr. Metz had previously been found not guilty by reason of insanity of Assault on a Victim over Sixty in the Second Degree, C.G.S. Section 53a-60b, a Class D felony, and Interfering with a Police Officer, C.G.S. Section 53a-167a., a Class A misdemeanor. He was committed to the PSRB for the maximum term of six years. Prior to the expiration of his maximum period of commitment, the state petitioned for an extension claiming that Mr. Metz remained mentally ill and a danger to himself and others. The trial court granted the state's petition to recommit and the acquittee appealed. It should be noted that Mr. Metz was represented by Attorney Monte P. Radler, Mr. McClellan's attorney in the instant matter. On appeal the acquittee made two arguments. First, the state could not petition the court for recommitment as the petition had not been filed at least 135 days prior to the expiration of his commitment as set out in C.G.S. Section 17a-593 (c). Our Supreme Court held that the 135 day period as specified was directory and not CT Page 2934 mandatory, and such a late filing did not automatically require dismissal of the petition.
Second, Mr. Metz claimed that C.G.S. Section 17a-593 was unconstitutional in that it required him, even after the expiration of his maximum criminal sentence, to prove that he was no longer insane in accord with the rules governing commitment of acquittees by a preponderance of the evidence. He argued that the procedure for such consideration should be in accord with the rules governing civil commitments and commitments of prisoners whose term of incarceration had ended. He claimed that it was ". . . unconstitutional for his further commitment to be ordered without the procedural safeguards afforded to those whose term of incarceration has expired or who, for other reasons, have been civilly committed." Metz, supra at 412.
The Metz court agreed that an acquittee whose maximum term had expired was entitled to greater procedural safeguards than he had been afforded. The Metz court resolved this issue in favor of Mr. Metz and future acquittees similarly situated. It specifically held ". . . To avoid such constitutional jeopardy, we construe Section 17a-593 (c) to require the state to bear the burden of proving the need for a period of continued commitment of an acquittee after the expiration of the maximum term specified by Section 17a-582 (e)(1)(A)." Metz, supra at 408. The court afforded such acquittees a further constitutional guarantee: not only must the state bear the burden of proof, but the standard of proof shifts in such cases from a preponderance of the evidence to a standard of clear and convincing evidence. The court removed the acquittee's burden of rebutting an indefinite presumption of continuing insanity and dangerousness to self or others. Thus, all post-Metz acquittees whose maximum term has expired shall only be recommitted if the state proves by clear and convincing evidence that the acquittee is currently mentally ill and dangerous to himself or others or is gravely disabled.
It is the opinion of this court, that is all that Metz requires. The acquittee in the instant case has asked this court to expand Metz and find that all civil commitment procedures should apply to this class of acquittees. The acquittee in the instant case urges the court to so find in order for this court to further find that the PSRB's report and recommendation should be stricken because civil commitment proceedings have no such report. This court declines to make such a "leap".
There is no question that the Metz court felt there were due process and equal protection concerns to the class of acquittees whose maximum term had expired. The Metz court felt that there was a latent ambiguity in the statute and addressed its concern by shifting the burden of proof from the acquittee to the state and by raising the standard of proof from CT Page 2935 a preponderance of the evidence to clear and convincing evidence. This court is not convinced that it should extend Metz beyond its stated directions and chooses not to do so.
Additionally, the acquittee has failed to convince this court that his constitutional rights will be violated if the instant proceeding is not treated as a civil commitment proceeding. To the contrary, the PSRB has effectively and convincingly argued that all of the attendant due process and equal protection rights append to this class of acquittees. There is no disagreement that ". . . commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection."Foucha v. Louisiana, 504 U.S. 71 at 79 (1992).
First, the court is not bound by the PSRB's report and recommendation. It is just that, a "report" and a "recommendation," mandated by statute. At the PSRB hearing which is held prior to the preparation of the report and recommendation, the acquittee has the opportunity to be represented, cross-examine witnesses, and present his own evidence and witnesses. In the instant case, counsel for the acquittee acknowledged that he and Mr. McClellan were present at the PSRB hearing, were allowed to question witnesses, and present witnesses which they declined to do. That report is then filed with the court and a hearing is scheduled. The acquittee has an opportunity to present an independent examination for the court's consideration. In the instant case, Mr. McClellan presented the court with such an independent examination by Dr. Zeman. At the hearing before the court, testimony is taken. The acquittee has the opportunity to and, in the instant case, did cross-examine the state's witnesses. At the hearing before the court, the acquittee has the opportunity to and, in the instant case, did present his own witness. At the hearing before the court, the acquittee has the opportunity to and, in the instant case, did argue that the state had not fulfilled its burden of proof by the clear and convincing standard.
At the conclusion of these proceedings, the court, as the final arbiter, reviews and weighs all of the evidence to either grant or deny the recommitment petition. There is nothing which this court finds in this fair and balanced procedure which diminishes the acquittee's due process or equal protection rights. While this procedure may not precisely mirror that of a civil proceeding, equal protection "does not require absolute equality or precisely equal advantages." Ross v. Moffitt,417 U.S. 600, 612 (1974).
For all of the reasons stated above, the acquittee's Motion to Strike the PSRB's report and recommendation is denied.
B. THE MOTION TO DISMISS CT Page 2936
The same arguments contained in the acquittee's Motion to Strike are reargued in acquittee's Motion to Dismiss. Mr. McClellan contends that this court should dismiss the state's Petition for Recommitment because his maximum term has ended. The argument repeats that subjecting Mr. McClellan to a recommitment proceeding under the criminal standard and not the civil standard is unconstitutional. He claims first, that a person who has been adjudicated not guilty by reason of insanity (NGRI) and has reached his maximum term of commitment currently does not receive the same or substantially the same procedural due process protections as any other individual subject to involuntary civil commitment. Second, he claims that an acquittee recommitted at the expiration of his maximum term of commitment does not receive the same or substantially similar rights and remedies as others involuntarily committed. The acquittee urges this court to find that for this class of acquittees for all purposes on Petitions for Recommitment the civil standard must apply. In sum, the acquittee argues that there is no justification for distinguishing between insanity acquittees and prisoners, in terms of post-recommitment legal rights, remedies and procedures.
In order for this court to give credence to the acquittee's argument, this court must extend the decision of our Supreme Court in State v.Metz, supra. Again, this court declines to do so. In challenging the constitutionality of a statute, the challenger "must sustain the heavy burden of proving its unconstitutionality beyond a reasonable doubt."State v. Breton, 212 Conn. 258, 269 (1989). The acquittee has not met this burden. The acquittee is not entitled to the same panoply of rights and process provided in the civil commitment process. As previously articulated, this is not what the equal protection clause envisioned. SeeRoss v. Moffitt, supra at 612.
For all of the reasons articulated in the court's Memorandum of Decision on the Motion to Strike, this court does not feel that the acquittee has been deprived of his constitutional rights. Accordingly, the acquittee's Motion to Dismiss is denied.
C. PETITION FOR CONTINUED COMMITMENT OF THE ACQUITTEE
As previously discussed, when an acquittee such as Mr. McClellan has reached his maximum term of commitment, the state must prove to the court by clear and convincing evidence "that the acquittee is currently mentally ill and dangerous to himself or herself or others or gravely disabled" in order for a court to recommit the acquittee. Metz, supra at 425. The court follows the statutory procedure set out in C.G.S. Section 17a-593 (c). Prior to said hearing on the state's Motion for Recommitment, the court reviewed the court file and all motions and CT Page 2937 memoranda of law submitted by counsel.
None of the parties disagree as to Mr. McClellan's diagnosis. Psychiatrically, he has a chronic schizoaffective disorder and is bipolar with elements of schizophrenia and changes in his emotional state. These disorders may manifest themselves in irritability, hypersexual behavior, hallucinations, delusions, and paranoia. These conditions are currently being treated with three medications, administered orally on a daily basis. Physically, Mr. McClellan suffers from cardiac myopathy, hypertension, anemia, asthma, and morbid obesity. These conditions are being monitored by twelve prescribed oral medications and diet. Mr. McClellan's psychiatric condition has varied in its stability and there have been periods during his commitment that his behavior has regressed necessitating medication adjustments. Similarly, there have been problems with his medical health during his commitment. His diabetes and pulmonary problems which are not aided by his obesity have taken their toll on his physical health. Currently, his overall status is described as frail/fragile but stable.
At the hearing this court heard testimony from Paul Rouleau, a forensic monitor employed at Connecticut Valley Hospital for the past 16 years and the individual who has monitored Mr. McClellan since 1999. At the hearing before this court, Mr. Rouleau testified on behalf of the board. He informed the court that Mr. McClellan is presently housed in Dutcher Hall at the Connecticut Valley Hospital campus in a unit which provides him with a relatively high level of privileges, including limited pass time and approved temporary leave from the grounds to attend outpatient treatment in the southeastern Connecticut community several times a week.
He testified of his concern for Mr. McClellan's inconsistency with treatment and his risk of unreliability citing three incidents during the summer of 2001 in which the acquittee lied about an incident at Reliance House (outpatient treatment center), lied about family members present at a home visit, and verbally threatened an elderly patient on the hospital unit. Mr. Rouleau felt that Mr. McClellan was ambivalent about leaving the hospital setting where he has resided for the past ten years and when presented with residential options, was uncooperative in selecting a community placement effectively "sabotaging" his ability to transition from the hospital. He also felt that Mr. McClellan had not fared well in the community prior to his original commitment and any transition would require a placement with the proper resources providing Mr. McClellan with supervision for medication and healthcare needs compliance and a host of support services.
At the present time Mr. Rouleau did not feel that the acquittee could CT Page 2938 be compliant with his own needs and that his past history of noncompliance would continue to make Mr. McClellan a danger to himself and others. He told Mr. Rouleau that if he could not care for himself, he would go to a shelter. The witness felt this would certainly be a poor setting for Mr. McClellan's need for both medication compliance and healthcare compliance. Without such compliance, Mr. McClellan would become a danger to himself and others.
Next, the court heard testimony from Dr. Patrick Fox, a consulting forensic psychiatrist from Yale who has been monitoring Mr. McClellan from a psychiatric standpoint since July of 1999. Dr. Fox stressed that if the acquittee did not take his prescribed psychiatric medications, he would decompensate in a short time. Such decompensation could include the return of delusions, thought process hallucinating, hypersexual behaviors, mood instability and depression.
Dr Fox's testimony traced the efforts to transition Mr. McClellan to the community since 1996. He confirmed that these transition plans have been interrupted in the past due to Mr. McClellan's psychiatric decompensation and his physical health. The most recent proposal is to place him at Martin House on the grounds of the Uncas on the Thames campus. He is currently on the waiting list with bed space available within the next four to six months.
Dr. Fox spoke with Mr. McClellan about his plans if this court denied the state's Motion for Recommitment and he were discharged by the PSRB on March 19, 2002, at the expiration of his recommitment term. Mr. McClellan told Dr. Fox that he would go to his mother's and tell her he had been released, he would then go to a shelter, and if he had trouble getting his medication, he would see if his brother could help him with a job, his medical appointments, and procuring his medicine although he had no psychiatrist or medical doctor selected. It should be noted that the acquittee currently takes fifteen prescribed medications daily: three for his psychiatric condition and twelve for his medical condition. Dr. Fox stated that all these prescriptions require monitoring and visits with a psychiatrist and medical doctor.
Dr. Fox felt that absent supervision and continued medication, there was a high likelihood that Mr. McClellan would decompensate in a relatively short period of time which would make him a danger to himself and/or others. To avoid such a decompensation and for Mr. McClellan to be successful in the community, he would need staff monitoring 24 hours a day to insure medication compliance and he would need psychiatric and medical providers in place for ongoing treatment. Mr. McClellan would also need to have his outpatient day treatment increased gradually so that he could successfully transition into a residential placement such CT Page 2939 as Martin House. Dr. Fox felt that absent any malingering by the acquittee, this plan could be accomplished within twelve to fourteen weeks. Dr. Fox conceded that since Mr. s commitment, he is unaware of any violent or inappropriate sexual behavior on the acquittee's part.
Next, Dr. Peter Zeman, a psychiatrist from the Institute of Living, testified and submitted a report to the court, dated February 25, 2002. Dr. Zeman conducted an independent psychiatric examination of Mr. McClellan at the acquittee's request. In preparing this report, Dr. Fox reviewed Mr. McClellan's very extensive file, including PSRB memoranda of decisions, six month reports, transcripts of hearings before the PSRB, a sexual offender evaluation prepared by Dr. Gibeau from August of 1999, an evaluation by Dr. Lowstein from March of 1966, and the original NGRI evaluation from August of 1993. Prior to preparing his report Dr. Zeman met with the acquittee on January 24, 2002, for one half hour. Dr. Zeman had previously met with Mr. McClellan on April 6, 2000, for one hour, on June 2, 2000, for one half hour, and on November 30, 2000, for three quarters of an hour. He also met with the acquittee's treatment team for one half hour on January 30, 2002.
Dr. Zeman agrees with Dr. Fox that Mr. McClellan needs psychiatric medications to maintain his current nonpsychotic mental status. He opined that Mr. McClellan understands that he has a mental illness and needs to take his medications as prescribed. He admitted that acquittee's stability will only be maintained if Mr. McClellan follows through with what he says he needs to do with medication compliance. Dr. Zeman did not believe that the acquittee was presently a danger to himself or to others based on his behavior while in PSRB custody. Dr. Zeman testified that Mr. McClellan's behavior has been supervised in a structured hospital setting with direct monitoring of his medication intake. Dr. Zeman concurred with the other medical experts' diagnosis: Mr. McClellan has a serious psychiatric disorder which is chronic and lifelong. He will continue to have this mental illness and medications will be needed to control it.
Dr. Zeman further agreed that if the acquittee does not take his medications, he likely would decompensate and if he decompensated, he could have boundary issues, become verbally abusive, and generally intrusive to others. Such a decompensation in Dr. Zeman' s opinion could manifest itself quickly, in a matter of days to months. He acknowledged that Mr. McClellan's condition has not radically changed since 1992; he is functioning due to his medications and his level of supervision. By reviewing acquittee's records, Dr. Zeman learned that about one month prior to the arrest for which Mr. McClellan was found NGRI, he had stopped taking his medications, he had not been sleeping, and he had gained significant weight. Because Dr. Zeman found Mr. McClellan's mental CT Page 2940 illness in remission, he testified that the acquittee showed no signs of an active mental illness which rendered him either of harm to himself or others or gravely disabled.
Prior to Dr. Zeman's appearance, all witnesses testified that if the court denied the Motion for Recommitment, Mr. McClellan would be discharged by the PSRB on March 19, 2002, and any residential placement for him would be voluntary on his part, as would his medication compliance. In response to this court's inquiry, Dr. Zeman testified that the acquittee needed case management for a period of time, supervision, regular psychiatric assessment, regular therapy, and to be taking his medications as prescribed. Dr. Zeman agreed that if the court denies this motion and Mr. McClellan was released, all of what Dr. Zeman testified Mr. McClellan needed would have to be done by Mr. McClellan on a voluntary basis. The court then asked Dr. Zeman whether or not Mr. McClellan would be able to independently take care of his needs . . Dr. Zeman answered: "I think it would be very difficult for him to do that, and I have some serious concerns that he would not be able to do that."
In sum, all the experts agree that Mr. McClellan has a chronic mental illness which is currently asymptomatic because Mr. McClellan is taking his psychiatric medications in a supervised setting. The acquittee's own expert agrees that the only way Mr. McClellan will stay asymptomatic is if he continues to take his medications and continues with therapy and regular psychiatric monitoring. Without medication, Mr. McClellan's mental status will decompensate and the symptoms of his mental illness will manifest themselves over a short period of time. When these symptoms reappear, Mr. McClellan will be mentally ill and will pose a danger to himself and/or others. Mr. McClellan' s own expert holds out little hope that Mr. McClellan will take his prescribed medications on a voluntary basis.
This court has reviewed all of the briefs filed in this matter, carefully reviewed the court's extensive file which includes many of the prior proceedings before the PSRB, read medical and psychiatric evaluations of Mr. McClellan and the exhibits entered into evidence during this hearing, and reviewed all of the six month reports as provided by stipulation of the parties. The acquittee's current mental status, though stable, is fragile. That fragility is directly and totally related to whether or not Mr. McClellan takes his medications. No expert before the court is convinced that he can do so on a voluntary basis. In not doing so, the acquittee's mental illness resurfaces and he becomes a danger to himself and others.
Accordingly, this court finds that the state has proven by clear and convincing evidence that Mr. McClellan, the acquittee, is mentally ill CT Page 2941 and therefore, a danger to himself and/or others. The state's Motion for Recommitment is granted. This court recommits Mr. McClellan to the custody of the PSRB for a period not to exceed eighteen months. This limited commitment is based on Dr. Fox's testimony that there is no reason, provided Mr. McClellan cooperates with the PSRB and a bed is available, why the acquittee could not be transitioned into the Martin House within a period of several months. This court had envisioned such a transition occurring when it granted the state's first Motion for Recommitment in 1999 and is dismayed that such action has not taken place to date. The court urges such a transition to take place during this short period of recommitment.
III. CONCLUSION
For all of the reasons set out in the court's analysis in Section II of the Memorandum of Decision, the acquittee's Motion to Strike and Motion to Dismiss are denied. The state's Motion for Recommitment is granted for a period not to exceed eighteen months.
Handy, J.